# JOEL G. MORGAN, for the use of Smyth,

*v.*

# JOHN H. OBERLY.

1. JUDICIAL SALE — *after a judgment has been paid — subsequent confirmation—rights of the different parties.* Where shares of stock in a company were sold under execution after satisfaction of the judgment, and the price bid deposited, under an arrangement that if the judgment had not been paid the sheriff was to take the same, but if satisfied, the bidder was to withdraw the same, and the latter took his certificate of purchase, and had the stock so sold transferred to him on the books of the company, and refused to restore the stock to the original owner, but withdrew the money so deposited, with the consent of the sheriff, who was ignorant of the use made of the certificate, and the sheriff was sued upon his bond, and his sureties compelled to pay the value of the stock sold, it was *held,* in a suit by the sheriff for the use of his sureties, to recover the price bid for the stock, that the recovery on the sheriff's bond, and its payment, vested a complete title to the stock in the bidder, and that he was liable for the sum bid therefor.

2. Where it being in doubt whether a judgment in a foreign county had been satisfied, and the sheriff had levied the execution on certain shares of stock in a printing association, and it was agreed by the sheriff and another that the latter should bid off the property in satisfaction of the execution, and deposit the amount of his bid, to be withdrawn in case the judgment had been satisfied, this will not justify such bidder in withdrawing the money without surrendering his certificate of purchase, or giving up the stock acquired by him under his purchase.

3. If personal property is sold under execution after satisfaction of the judgment, under such circumstances as to amount to notice to the pur-

chaser, of the satisfaction, yet if the execution debtor sues the sheriff, and recovers the value of the property so sold, and the same is paid by the sheriff or his surety, this will make the sale valid and vest a complete title in the purchaser, and the sheriff or surety so having paid will be entitled to the money bid at the sale.

4. Where shares of stock in a printing association are illegally sold on execution, after payment of the judgment, but the irregularity is cured by the defendant in the execution collecting the value of his stock of the sheriff, a subsequent arrangement between the defendant in execution and the purchaser, by which other stock is acquired and all canceled, each taking a certain share in the concern, will not affect the sheriff's right to collect the sum bid for the shares, whether made before or after the recovery against him.

APPEAL from the Circuit Court of Alexander county; the Hon. DAVID J. BAKER, Judge, presiding.

Messrs. LINEGAR & LANSDEN, for the appellant.

Messrs. GREEN & GILBERT, for the appellee.

Mr. CHIEF JUSTICE SHELDON delivered the opinion of the Court:

In October, 1867, Morgan, the appellant, then sheriff of Alexander county, having in his hands an execution in favor of Alexander G. Boyer, of Piatt county, against Thomas Lewis, of Alexander county, issued out of the circuit court of Piatt county, levied the same upon fifty shares of the capital stock of the "Cairo Democrat Company," as the property of Lewis.

Morgan advertised the sale under the execution for October 29. 1867, and when the time for the sale arrived, Oberly, the appellee, the editor and general manager of the Cairo Democrat Company, was present to bid on the stock. Just before offering the stock for sale, a telegram from Boyer and a letter from Lewis, the plaintiff and defendant in the execution, were placed in Morgan's hands, informing him that the judgment had been paid.

A consultation was had between Morgan, Oberly, and Mr. Wheeler, the attorney of Boyer, (Wheeler expressing some distrust as to the payment,) and an agreement come to that

Morgan should put up the stock for sale, that Oberly should bid, and that if the stock was knocked down to him, the money for the same should be deposited in bank, to be drawn out by Wheeler if the judgment had not in fact been paid, and by Oberly if it had been paid. In pursuance of this arrangement, Morgan put up the stock for sale, and Oberly bid therefor $887.50, and being the highest bidder, it was struck off to him, and the money deposited in the City National Bank, according to the agreement, Oberly receiving from Morgan the regular, ordinary certificate of purchase.

On the next day, October 30, 1867, Oberly gave written notice of his purchase to the president of the company, inclosing the certificate of purchase, and requested him to convene a meeting of the board of directors, for the purpose of having the stock transferred to him on the books of the company. This request was complied with the following day, October 31, and a certificate of transfer of the stock issued to him, and the transfer noted upon the books of the company. The certificate of purchase was filed among the records of the company. Oberly, afterward, becoming satisfied that Lewis had paid the judgment at the time of the sale, told Morgan that he wanted his money out of the bank, and on February 28, 1868, drew it out, with the assent of Morgan and Wheeler.

Lewis brought suit on Morgan's official bond as sheriff, and recovered judgment against the latter and his sureties for the value of his stock, and Bernard Smyth, one of the sureties, having paid the judgment, brought this action in the name of Morgan, but for his own use, against Oberly, for the price of the stock purchased by the latter October 29, 1867. Upon trial by the court without a jury, judgment was rendered for the defendant, and the plaintiff took this appeal.

The judgment against Lewis had been paid by him on the day before the sheriff's sale under the execution, and, by the strict literal terms of the arrangement under which the amount of his bid for the stock was deposited in bank, Oberly was entitled to have the money back, but not according to the true intent and meaning of that arrangement. He was willing, and

undertook to pay the price which he bid for the stock, and it was not the intention that he should have the money and stock both. The day after the execution sale, he sent his certificate of purchase to the office of the company, and procured it to make a complete transfer of the stock to himself. He then held the stock, and upon receiving the money from the bank, he should have restored the stock to Lewis. True, this was not expressed, in terms, by the agreement, but it was implied from the very nature of the transaction. There are promises which the law implies, as well as those which the parties themselves make in express terms.

The point is made of Morgan's consent to the withdrawal of the money from the bank, as precluding him from a recovery for it. The uncontradicted testimony of Lewis is, that shortly after the sale he called on Oberly, informed him of the payment of the judgment, and requested him to transfer the stock back to witness; that he also applied to the officers of the company, and told them he wanted his stock, and that Oberly refused to surrender the stock back until witness made the compromise, (which will be hereafter referred to,) saying, he meant by that, Oberly never told him he would deliver the stock back to him, and also, that Oberly, at the time, said his impression was that witness was the owner of the stock, and he (Oberly) had the legal title.

There is nothing to show that Morgan had knowledge of anything that transpired subsequently to his sheriff's sale. At the time he consented to the money being withdrawn, he must have supposed things stood as they did at the time the money was deposited; that Oberly but had in his hands the certificate of purchase, which he would surrender up at any time. Had he been informed that Oberly had subsequently been making use of such certificate in consummating title in himself to the stock, by delivering up the certificate to the company, and procuring thereupon a transfer from the company of the stock to him, and that upon a subsequent demand by Lewis, he had declined to transfer to him the stock, thereby rendering Morgan himself liable to Lewis for the value of the

stock, it can not be supposed that Morgan would have consented to the payment over of the money to Oberly. This consent, then, of Morgan, without knowledge of such subsequent facts, we consider as of no avail against the assertion of his present right.

Had Oberly, on receiving back this money, restored to Lewis all that he obtained under and through the execution sale, as he ought to have done under the arrangement through which the money was deposited, Morgan would have been saved from liability to Lewis for the value of the stock. At least, such return of the property would have gone in reduction of damages, and the liability have been for no more than nominal damages. Oberly having, by his conduct subsequent to the sheriff's sale, in insisting upon and having it carried out as an absolute sale, fixed upon Morgan a liability for the value of the stock which has been discharged by payment, it is but just that he should respond to Morgan as upon an absolute sale, and pay to him the price which he promised to pay for the stock. And the more so, in view of the suit of Lewis against Morgan. In bringing this suit against Morgan, as converting the property, Lewis elected to ratify the sale made by Morgan, and the recovery of the judgment therein and the satisfaction of the same, vested the property in Oberly, so that his title was made complete, and he placed in as good condition as if the judgment against Lewis had not been paid at the time of the sale under the execution against him.

Oberly sets up by way of excuse, in his evidence, that he told Lewis he had no stock, but a certificate, and that he might have that when he was satisfied of the payment of the judgment before the sale. Lewis had a receipt of the payment of the judgment on the 28th of October, 1867, the day before the sale. Oberly admits that Lewis told him he had paid the judgment, and that he became satisfied of the fact of the payment some time before he drew the money from the bank. He should then have transferred back the stock to Lewis, as had been previously demanded of him.

Oberly says he never exercised ownership over the stock after drawing the money from the bank February 28, 1868. He was, in legal contemplation, in the exercise of such ownership all the while that he was holding all the *indicia* of ownership of the stock which he had procured from the company.

Lewis was president of this company. Oberly testifies that on August 1, 1868, there was an agreement between him and Lewis to settle all their difficulties, and go into the company as equal owners; that he then said to Lewis that he did not think he owned the stock; that Lewis said he knew witness did not own it. "We agreed to throw all our stock into a 'pot,' waiving all discussion as to ownership, he and I getting all the stock of the company, and dividing it." He thinks all the stock was assigned to Fagan, and by him equally to them, Oberly and Lewis; that he sold the half he got, a day or two afterwards, to Lewis, for $500. There appears to have been a canceling of certificates of stock at this time, among which the certificate of these fifty shares of stock was canceled. Lewis refers to this transaction, in his evidence, as a compromise.

We are unable to make out anything in this, adverse to the recovery sought. We do not understand at what time it took place, with reference to the suit of Lewis against Morgan and his sureties, whether before or after, as the record does not show the time of that suit. If after, it manifestly should be without effect upon the rights of Morgan. And if before, we can attach to it no special consequence. We do not understand it to have been a surrender up of this stock to Lewis, without any consideration.

The judgment will be reversed and the cause remanded.

*Judgment reversed.*